The Chief Justice
delivered the opinion of the court.
From a number of documents and affidavits presented to us, the material facts in this case may be stated as follows : Matthias Williamson obtained judgment against Oliver Johnston in *this court, in September term, 1824. On the 26th day of March, 1825, judgment by confession on bond and warrant of attorney was entered up in this court, against Oliver Johnson, in favor of Daniel Snowhill; and a fieri facias de bonis et terris; endorsed to levy eight hundred and seventy-nine dollars and eighty-seven cents of debt, and five dollars of costs, with interest, was delivered on the 27th of the same month to Andrew Snowhill, the sheriff of the county of Middlesex. He levied on sundry goods and chattels and certain real estate, and made return of the writ to the ensuing term: The goods and chattels levied on were *101 not removed, but were permitted to remain in the possession of Johnston, the defendant, who continued to use thorn, as he had previously done, until the sale hereafter mentioned. The judgment of Matthias Williamson being revived on scire facias at September term, 1828, a fieri facias de bonis terris issued thereon, was delivered to Sheriff Edgar of tho same county, on the 17th January, 1829, who levied on the goods and chattels afterwards sold by Sheriff Snowhill, and also on certain real estate. On the 26th of January, Editar advertised the goods and chattels for sale on the 2d of February, at twelve o’clock, noon. On the 28th of January, Andrew Snowhill advertised the goods and chattels for sale on the same second of February, at ten o’clock in the forenoon. Andrew Snowhill made sale accordingly of the goods and chattels he had levied on, with some exceptions. “ Several articles levied on by him were not sold; carriages, horses and farming utensils were levied upon, and out of them only one horse was sold.” And “something like a ton of fresh hay,” “ apparently of the last year’s growth,” u was sold in the barn..” The articles sold were not removed from their places at the time of the sale, but remained as before in the possession and use of Oliver Johnston and his family; and were so on the 19th of March succeeding, the last date at which they are spoken of. Daniel Snowhill and another person for him, others also bidding, purchased all the articles which were sold; and ho gave to Sheriff Snow-hill a receipt or discharge on the execution for the amount of sale. Sheriff Snowhill in his affidavit states that he did not remove any of the goods upon making his levy, but left them, as they were, in the house. He left them at his own risk, as he has *been in the habit of doing in other cases. He presumes that Daniel Snowhill directed him to delay the sale of the property, but has no recollection of the fact.
Upon a rule to shew cause, Matthias Williamson claims an order that the amount of sales, which by agreement is *102 considered as in court,' be paid to him; and the question-is, under these facts, which of the executions is entitled to-prevail ?
.The general doctrine was laid - down by this court in» Casher v. Peterson, strictly conformable as I believe, to both the law and the practice of this state. “ In this country,”" say the court, “ it has not been the custom, nor is it necessary that the goods should be actually removed by the-officer. • They are left in the hands of the defendant at his» request and for his benefit and accommodation, and he must-be considered as the agent and his house as the storehouse of the officer for this purpose. If the execution should not be pursued,0 and a subsequent one be levied on the same-property, then it will always be a question whether the first was kept up merely by color and for fraudulent purposes; and if so, the last shall prevail, but if otherwise, the goods shall be holden by the first' levy.” An instant removal of the goods levied on, is as inconsistent with the law and practice of our state, as it is in most cases, with sound policy and the dictates of humanity. ■ Nor -am I satisfied that a delay on the part of the execution creditor, or an order tot-lie officer, after levy, to stay proceedings until farther orders, or even an order to stay, unless urged by younger executions, is, or ought to be deemed, per se and conclusive evidence of fraudulent purpose so as to postpone the first execution. Either the one or the other may in many cases-be reconciled with good faith and upright intentions. Such delays and for honest purposes have, as we all know, long; been usual in our community. I believe I may safely appeal, to the experience of almost every practising attorney.. A reasonable delay oftentimes enables the debtor to-gather in his means and satisfy the execution, without being inevitably and irretrievably exposed to the ruin and distress which await him, if no lenity can. be shewn but at the peril of the debt. And who is-injured thereby ? The argument that by the possession. *103 of the property the debtor may obtain credit from others is doubtless of weight. But does it not also apply to *him who holds a judgment without execution, or him who holds a bond with warrant of attorney, either of whom, when occasion presses, may suddenly interpose with an execution to the exclusion of him who may have been induced to give credit on the faith of the property. And is there not even greater hazard to other creditors from such, because less likely to be known, than from an execution in the hands of a public officer ? In all these cases, however, the question of fraud may arise; and whenever fraud exists, its usual effect is produced, to destroy whatever it taints. Evils will doubtless sometimes result from collusion ; but does not experience prove them to be much less than those caused by the strict rule of no delay and immediate removal ? Indulgences will he given by creditors under any rule however rigid; and may it not be the better policy that they should he allowed, when done in good faith and without provable detriment to others ? Is not such the language of the customs if not of the laws of our own community ? Upon these points it is not necessary, nor do I intend, now7 to express an opinion.
The question then which, according to the rule laid down in Casher v. Peterson, we are now to resolve from the facts before us is, whether the first execution in favor of Daniel Snowhill was kept up by color and for fraudulent purposes. And by! the term, fraudulent purposes, I understand not only actual fraud and dishonesty, hut what is denominated legal fraud, forbidden by the law without involving moral turpitude; such as Justice Washington speaks of in Berry v. Smith, 3 Wash. 60, “ a design to protect the property, which in contemplation of law amounts to a fraud, however innocent and even praiseworthy, on the ground of benevolence, the motive be which induced it.”
The circumstances of this case lead irresistibly, I think, to the conclusion, that this execution was kept up to secure *104 to Oliver Johnston the undisturbed use of the goods and chattels and to prevent any creditor from taking them away from him by legal process to satisfy his debt. If so, the latter execution must be preferred. The law will not sanction such a purpose however kind and benevolent on the part of Daniel Snowhill toward his son-in-law Johnston.
This execution was delivered to the sheriff on the day after *the-judgment was obtained, and was then levied. During nearly four years, nothing further was done. Ho payments, even partial, were made towards the debt. The goods remained in the possession of Johnston. He used them as before, consumed some, such as the hay, and sold some, such as the wagon, if not one or more of the horses. While the value of the property was diminishing by time and use, the debt originally large was increasing by the accumulation of interest to an amount to which the property as it now appears is entirely inadequate. The plaintiff takes no step until an advertisement for sale is made by another sheriff under another execution. And may we not suppose he would not even then have advertised, but for the exigency of the 'other creditor ? The property was sold; and although others bid, every article was purchased by Daniel Snowhill, in truth, for what was struck off to another was designed for him. And without, even then, the removal of an article, the whole property remains as before in the possession and use of Johnston. Was the purpose of Daniel Snowhill, by means of the execution and levy, to effect a payment of his debt ? Every thing seems irreconcilable with it. • He sought no sale for a very long period. When a sale was made, no money was raised; and he, by out-bidding, prevents any other from purchasing any of the property. Was the purpose to secure the ultimate payment of his debt by means of the property ? While the property was -on the wane, his debt was on the 'increase. Ho payment is at length actually made, for he chose to have the property. And the whole *105 remains as before in the enjoyment of Johnston, and without any arrangement, so far as we learn from the evidence, for the delivery of it, or any compensation for the use of it.
Every fact, throughout the affair, seems to quadrate with a determination that Johnston should enjoy the property, that no creditor should disturb or deprive him of the use of it, that the execution should remain dormant as to him, but be a vigilant Cerberus against others, and that the great purpose was not to pay or secure the debt of Snowhill, but to protect the property in tho hands of Johnston fronj all creditors.
In the practice and decisions on this subject elsewhere, we find a rule, in some places more, in others less rigid, to have *been pursued and enforced; but all, it is believed, would condemn the present transaction. The common law as understood in England, seems rigidly to require that the goods be removed or an officer be loft on the premises with them. Bradley v. Windham, 1 Wils. 44. In Cowden v. Brady, 8 Serg. and Rawle 510, Justice Gibson said, the only exception in Pennsylvania to the rule that the levy is held to be fraudulent where the goods are left in the hands of the defendant, is confined to household furniture; and even there the plaintiff must use reasonable diligence. In Kellog v. Griffin, 17 John. 274, the sheriff was instructed to make a levy on the property of tho defendant, but to do nothing until ordered, unless crowded by younger executions, but by no moans to let the execution lose its preference. The court held the inference to be warranted that the plaintiffs had issued their execution, not with an absolute intention of collecting their debt, but partly at least, with a view to cover the property of the debtor for his use. In Storm v. Woods, 11 John. 112, a like direction having been given to tho officer, the first execution was postponed. In Doty v. Turner, 8 John. 20, the court said, “ If a long time had intervened between the one execution and the other, it would have been ground for a jury to have inferred the *106 consent of the plaintiff to the delay; and might have established the legal presumption of fraud.” In Russel v. Gibbs, 5 Cowen 390, Chief Justice Savage reviews the cases in Hew York for the purpose of shewing that “in most, if not all, there had been some instruction given to the sheriff by the plaintiff to delay the collection of the money.” He says, “ There may be cases undoubtedly, where an unreasonable delay or omission to urge on the sheriff to do his duty will be construed into a consent on the part of the creditor to the delay.” In Barnes v. Bellington, 1 Wash. 37, and in Berry v. Smith, 3 Wash. 60, a very strict rule was held by Judge Washington in the Circuit Court of the United States.
Without, however, intending to draw either aid or illustration from these cases, in the application of the doctrine of Casher v. Peterson, and without saying how far either of them is conformable to our law, I consider the facts before us clearly within that doctrine, and that the second execution is entitled to prevail.
*A question was raised at the argument, by the counsel of the plaintiff in the first execution, upon the authority of this court to interfere in a summary way ; and we were urged to leave the second plaintiff to redress by action. The power of the court in a summary way to adjust priorities among contending executions, and to dispose of moneys arising from sales, has been exercised in very many instances, and is settled by a train of decisions. A very persuasive argument in support of it may be found in the command of the fieri facias to the sheriff to bring the money into court. There may be circumstances which would render a trial by jury under a feigned issue or otherwise, very eligible to fix and settle -disputed matters of fact. But I do not find such here, as in my opinion should induce us to deny a remedy, as to the avails of the goods and chattels, in the manner now sought.
Both executions were also levied on real estate, and Matthias Williamson claims an order that the amount of sales *107 under the execution of Daniel Snowhill should be paid to him. The situation of real and personal estate when levied on, is widely different. So is the effect of sales. If by virtue of his judgment and execution, Mr. Williamson has a prior lien on the real estate, the sale under the subsequent judgment and execution, will not defeat or prejudice it. He has sold or may yet sell, and thus reap the fruit of his priority. Moreover, he can have no claim on the amount of the sale under Mr. Snowhill’s execution unless he affirms the sale. He cannot be permitted to receive the amount raised by that sale, and then sell the same lands under his own execution.
In my opinion, then, an order should be made for the payment of the sales of the personal estate to Matthias Williamson, and inasmuch as he affirms the sale by asking the money raised thereby, the execution fees of Sheriff Snowhill should be first deducted. The application as to the real estate should be overruled.
Order made accordingly.